**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 18, 2020

*Stephens, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 18, 2020

*Susan L. Carlson*

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| LAKEHAVEN WATER AND SEWER DISTRICT, HIGHLINE WATER DISTRICT, and MIDWAY SEWER DISTRICT, municipal corporations, | NO. 96585-4 |
| Appellants, | |
| v. | EN BANC |
| CITY OF FEDERAL WAY, a municipal corporation, | Filed: June 18, 2020 |
| Respondent. | |

STEPHENS, C.J.—This case is about the authority of one municipal corporation to impose an excise tax on another municipal corporation doing business within its borders. A code city adopted an ordinance that levies an excise tax on all businesses providing water or sewer services within the city's limits. Several water-sewer districts petitioned for declaratory judgment, arguing the city lacked express

legislative authority to impose the tax on them. The districts also raised a governmental immunity defense. They further challenged the ordinance on constitutional grounds, arguing it violates both due process vagueness principles and privileges and immunities antifavoritism principles. The parties cross moved for summary judgment, and the superior court granted summary judgment in the city's favor. We granted direct review.

Courts play a limited role in reviewing challenges to local tax policy. Under Washington's constitutional framework, the legislature delegates authority to local governments to levy taxes, and we interpret that delegation of local taxing authority for compliance with the constitution and the general laws of the state. The legislature here granted code cities broad authority to levy excises on *all* places and kinds of business. That policy prescription contemplates code cities may choose to exercise their local taxing power by imposing excises for regulation or revenue on the business of providing water-sewer services to ratepayers. We hold the governmental immunity doctrine does not bar the city from taxing the districts because they perform a proprietary function when they engage in this business. As for the districts' constitutional claims, they lack standing to bring such claims. For these reasons, we affirm.

FACTS

The city of Federal Way (City) is a noncharter code city incorporated under Title 35A RCW.[1]  In the winter of 2018, the city council held a special meeting concerning the City's looming budget deficit.  There, the City's finance director advised, under the 2017-18 budget, the City faced a shortfall of more than $850,000 because of various fiscal concerns.  The City had identified and implemented cost-saving measures, but these spending cuts could not close the deficit.  The City thus considered several potential sources of new revenue, including levying an excise tax on water and sewer utilities.  The council found it necessary to expand the kinds of excises levied in order to pay for basic municipal services and to meet the budget deficit.

In passing the ordinance, the council relied on RCW 35A.82.020, which it concluded gave the City broad authority to impose excises for regulation or revenue regarding all places and kinds of businesses.  It also observed that more than 150

---

[1] The term "code city" refers to a municipality that adopts its charter under Title 35A RCW, the Optional Municipal Code, or elects to be classified as a code city.  RCW 35A.01.020, .030, .035.  "The term 'code city' means any noncharter code city or charter code city."  RCW 35A.01.035.  The distinction between a charter and noncharter code city has no relevance to the issues presented.

Title 35 RCW governs first-class and second-class cities and towns.  First-class cities adopt their charters under article XI, section 10 of the Washington Constitution and do not operate under Title 35A RCW.  RCW 35.01.010.  Second-class cities and towns similarly do not operate under Title 35A.  RCW 35.01.020, .040.

cities and towns in Washington impose an excise tax on the gross incomes of utilities providing water and sewer services.[2] The council determined that it was in the public's best interest to impose the tax.

So, the City adopted an ordinance amending the Federal Way Revised Code (FWRC), ch. 3.10, governing utility taxes.[3] At issue is FWRC 3.10.040, which provides:

> There are levied upon and shall be collected from everyone, including the city, on account of certain business activities engaged in or carried on in the city, occupation taxes in the amounts to be determined by the application of rates given against gross income as follows:
> . . .
> (9) Upon everyone engaged in or carrying on the business of selling or furnishing water services for commercial, industrial, or domestic use or purpose, a tax equal to 7.75 percent of the total gross income from such business within the city during the period for which the tax is due; and
> (10) Upon everyone engaged in or carrying on the business of furnishing sewer services for commercial, industrial, or domestic use or purpose, a tax

---

[2] According to the Association of Washington Cities' recent Tax and User Fee Survey, 166 out of 231 responding cities imposed an excise on water utilities and 152 responding cities imposed an excise on sewer utilities. Clerk's Papers (CP) at 52, 605-06; *see also City of Wenatchee v. Chelan County Pub. Util. Dist. No. 1*, 181 Wn. App. 326, 343, 325 P.3d 419 (2014) (noting the surveys suggest that most Washington cities rely on a utility tax on water).

[3] Before the amendment, "FWRC 3.10.040 . . . impose[d] an excise tax on the gross incomes of the following: telegraph businesses; competitive telecommunication services; network telecommunication services; cellular telephone services; businesses selling, brokering or furnishing natural gas for domestic, business or industrial consumption; the City for the conduct, maintenance, and operation of its municipal storm drainage system as a public utility; businesses selling or furnishing electric energy; businesses collecting solid waste; and cable communications businesses." CP at 613-14; *see also* FWRC 3.10.040(1)-(8).

> equal to 7.75 percent of the total gross income from such business within the city during the period for which the tax is due.

Federal Way Ordinance 18-847, § 1 (Mar. 20, 2018).

Lakehaven Water and Sewer District, Highline Water District, and Midway Sewer District (collectively Districts) are municipal corporations formed under Title 57 RCW. Each provides water or sewer services (or both) to ratepayers within and without the City's limits. The Districts petitioned for declaratory judgment, arguing the City lacked express legislative authority to impose the tax. The Districts also raised a governmental immunity defense. Under this theory, the Districts argued the provision of water and sewer services is mostly public or governmental in nature, thus precluding imposition of the tax. The Districts also sought relief on constitutional grounds. They claimed (1) the ordinance violates due process as void for vagueness under both the Fourteenth Amendment of the United States Constitution and article I, section 3 of the Washington State Constitution, and (2) the City's exemption of another municipal corporation (the city of Tacoma) under a preexisting franchise agreement violates article I, section 12 antifavoritism principles.

In answering the petition, the City relied on RCW 35A.82.020. The City maintained its delegated taxing authority encompasses an authorization to tax a municipal corporation's proprietary business activities, including providing water-

sewer services. The City also challenged the Districts' standing to bring the suit and contested the merits of the Districts' constitutional claims.

The parties cross moved for summary judgment, essentially debating five issues, including whether (1) RCW 35A.82.020 grants the City express legislative authority to impose an excise on the Districts, (2) the governmental immunity doctrine prevents the City from imposing the tax on the Districts, (3) the Districts have standing to bring their constitutional challenges under the due process and the privileges and immunities clauses, (4) the ordinance is void for vagueness, and (5) the City's exemption of another municipal corporation under an preexisting franchise agreement violates article I, section 12 antifavoritism principles.

The superior court granted the City's motion for summary judgment and denied the Districts' motion. Relying on *City of Wenatchee v. Chelan County Public Utility District No. 1*, 181 Wn. App. 326, 325 P.3d 419 (2014), the court ruled RCW 35A.82.020 authorizes the City to impose excise taxes on other municipal corporations if the income derives from proprietary functions. Still, the court noted the Districts operate in both proprietary and governmental capacities. In the court's view, the "[p]roprietary function is seen in the provision of water and sewer services to benefit directly billed customers who requested the services and governmental

function is seen in the provision of services that protect the health, safety and welfare of the general public." Clerk's Papers (CP) at 1527.

It also ruled that the Districts had standing to bring their constitutional claims but rejected their arguments on the merits. The superior court concluded the ordinance's definition of "gross income" was not vague and thus did not violate due process. Even though the ordinance did not state the tax was on only income derived from proprietary business activities or distinguish what conduct was proprietary or governmental to calculate total gross income, it ruled the ordinance was constitutional. The superior court noted, however, that "[s]pecific determination of what is proprietary or governmental generated income for purposes of taxation may be the subject of future litigation." CP at 1529.

Finally, the superior court ruled that the ordinance did not favor the city of Tacoma over other municipal corporations but merely adhered to a preexisting franchise agreement. It reasoned that, under the bargained-for exchange, the City would receive public fire protection and payment of associated costs for public fire protection in exchange for not imposing the utility tax at issue.

We granted the Districts' motion for direct review. The Washington State Association of Municipal Attorneys and Association of Washington Cities filed a joint amici brief in support of the City. The Washington Association of Sewer and

Water Districts, Alderwood Water and Wastewater District, and the Rental Housing Association of Washington each filed amicus briefs in support of the Districts.

## I. STANDARD OF REVIEW

We engage in the same inquiry as the superior court when reviewing a summary judgment order. *Okeson v. City of Seattle*, 150 Wn.2d 540, 548, 78 P.3d 1279 (2003). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We review questions of statutory interpretation and constitutional law de novo. *Watson v. City of Seattle*, 189 Wn.2d 149, 158, 401 P.3d 1 (2017). When interpreting a statute, our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). When determining legislative intent, we examine "the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found." *Id.* at 10.

## II. AUTHORITY TO IMPOSE LOCAL EXCISE TAXES

"Municipal corporations have no inherent power to tax." *Watson*, 189 Wn.2d at 166. Yet the constitution allows the legislature to delegate taxing authority to

municipal corporations. *Id*. (citing WASH. CONST. art. VII, § 9 ("[A]ll municipal corporations may be vested with authority to assess and collect taxes.")); *see also* WASH. CONST. art. XI, § 12. The Districts claim the legislature did not delegate the City "express" authority to impose the contested tax and one municipality may not tax another without an "express" statutory authorization. The City counters that RCW 35A.82.020 supplies the required taxing authority. That statute provides:

> A code city may exercise the authority authorized by general law for any class of city to license and revoke the same for cause, to regulate, make inspections and to impose excises for regulation or revenue in regard to all places and kinds of business, production, commerce, entertainment, exhibition, and upon all occupations, trades and professions and any other lawful activity.

RCW 35A.82.020.

RCW 35A.82.020's plain language delegates code cities broad authority to impose business and occupation excise taxes. RCW 35A.82.020 provides code cities may impose such taxes on "*all* places and kinds of business." (Emphasis added.) The legislature did not distinguish between public and private business entities. The plain language does not restrict the term "all" to only private corporations. The statute means what it says: *all* means all.

Moreover, under this provision, if general law grants any other class of city[4] the authority to impose business and occupation excise taxes, code cities may exercise that authority as well. *See id*. ("A code city may exercise the authority authorized by general law for any class of city.").

In *Watson*, we held the legislature delegated broad taxing authority to first-class cities under RCW 35.22.280(32), including the authority to levy local business and occupation taxes. 189 Wn.2d at 165-68. There, the city of Seattle adopted an ordinance imposing a "Firearms and Ammunition Tax" on each firearm and round of ammunition sold within the city's limits. *Id*. at 155. The relevant statute provided, "Any city of the first class shall have power: . . . [t]o grant licenses for any lawful purpose, and to fix by ordinance the amount to be paid therefor." RCW 35.22.280(32). We noted the legislature granted cities authority to issue licenses for the dual purpose of regulation or revenue. *Watson*, 189 Wn.2d at 167-68. "Licensing authority [thus] includes the authority to raise revenues by taxing local businesses." *Id*. at 167. But this type of taxation "must fall into one of three categories: property, income, or excise taxes." *Id*. The most common type of excise tax is the business and occupation tax, which cities levy on the privilege of engaging in business and measure by gross income or receipts. *Id*.

---

[4] *See generally* chs. 35.22 (first-class cities), 35.23 (second-class cities), 35.27 (towns), and 35.30 RCW (unclassified cities).

Because first-class cities enjoy a broad legislative authorization under RCW 35.22.280(32) to impose business and occupation taxes, *Watson*, 189 Wn.2d at 165-68, we hold code cities may also exercise that broad authority under RCW 35A.82.020.

That said, cities imposing such taxes must generally comply with chapter 35.102 RCW, which governs municipal business and occupation taxes.[5]  RCW 35.102.140.  At the same time, the legislature drafted that chapter *not* to apply to taxes on any service that has historically or traditionally been taxed as a utility business for municipal tax purposes, including water or sewer services.[6]  RCW 35.102.020(4).  Quite simply, this related statute shows the legislature intended for cities to have the broad authority to levy local business and occupation excise taxes on water and sewer services, among other utilities.  *See id.*

In a Court of Appeals case directly on point, a code city brought a declaratory judgment action against a county public utility district, seeking a determination that the legislature authorized the city to impose a utility tax on domestic water sales. *Chelan County Pub. Util. Dist.*, 181 Wn. App. at 330-31.  The city argued that RCW 35A.82.020 included the authority to tax domestic water sales by another municipal

---

[5] This chapter defines a "city" as "a city, town, or code city." RCW 35.102.030(2).

[6] This statute also does not apply to a light and power business, or a natural gas distribution business, a telephone business, cable television services, drainage services, solid waste services, or steam services.  RCW 35.102.020.

corporation that take place within the city's limits. *Id*. at 331. The court determined "[t]here is no ambiguity in the statute's grant to code cities of the authority to impose excises for revenue." *Id*. at 337. It noted RCW 35A.01.010 requires "'[a]ll grants of municipal power . . . shall be liberally construed in favor of the municipality.'" *Id*. (quoting RCW 35A.01.010). And it held, "RCW 35A.82.020's grant of taxing authority is broad and, on its face, sufficient to support one municipality's taxation of another government's conduct of activity within its borders." *Id*. at 336. We agree with *Chelan County Pub. Util. Dist.* and hold this statute, when read along with related statutes and provisions, provides the City sufficient authority to impose the business and occupation excise tax on the Districts.

Despite the clear legislative intent outlined above, the Districts insist that RCW 35A.82.020 gives the City no actual taxing authority. They contend *King County v. City of Algona*, 101 Wn.2d 789, 681 P.2d 1281 (1984), requires the City to show an additional and specific "express" authorization giving one municipal corporation the authority to tax another. This argument seizes on our statement "that municipalities must have *express* authority, either constitutional or legislative, to levy taxes." *Algona*, 101 Wn.2d at 791.

At the heart of the parties' controversy and the Districts' reading of *Algona* are two competing theories of municipal law: home rule and "Dillon's Rule." Home

rule grants municipalities the broadest powers of local self-government, while Dillon's Rule would limit municipal powers to only those expressly granted by the constitution or the state legislature. *See generally* Hugh Spitzer, *"Home Rule" vs. "Dillon's Rule" for Washington Cities*, 38 SEATTLE U. L. REV. 809 (2015). Even though Dillon's Rule has been superseded by the optional municipal code for over 50 years, remnants of that antiquated theory have persisted in our case law and animate the Districts' arguments on this issue.[7] The City's arguments, in contrast, properly reflect the home rule principles of the relevant statutes.

The Districts' proposition requiring a delegation in "express" terms does not have its roots in the constitution itself or current statutes. *See generally* WASH. CONST. art. VII, § 9; art. XI, § 12; Titles 35, 35A RCW. Instead, that proposition grew out of John F. Dillon's influential, yet dated treatise, which gained popularity in the late-nineteenth century. Spitzer, *"Home Rule," supra*, at 810, 813-16. Dillon's theory of municipal government, which became known as Dillon's Rule, encourages strict construction of laws relating to the powers of municipal corporations:

---

[7] Our analysis here applies only to cities classified under the optional municipal code, Title 35A RCW. *See* Spitzer, *"Home Rule," supra*, at 858 ("The lack of express anti-Dillon's Rule language in their statutes arguably means that the rule still applies to second class cities, to towns, and to noncharter counties."). Whether Dillon's Rule survives in other contexts is not currently before us.

> "It is a general and undisputed proposition of law that a municipal corporation possesses, and can exercise, the following powers, and no others: First, those granted in *express words*; second, those *necessarily or fairly implied* in, or *incident* to, the powers expressly granted; third, those *essential* to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied."

*Id*. at 816 (quoting JOHN F. DILLON TREATISE ON THE LAW OF MUNICIPAL CORPORATIONS § 55, at 101-02 (1872)). Early in this state's history, this court applied Dillon's Rule for municipalities.[8]

By the mid-twentieth century, however, Dillon's Rule lost steam in light of the progressive era home rule movement. *See generally* Spitzer, *"Home Rule," supra*, at 810, 816-24. The home rule principle stands for the "presumption of autonomy in local governance . . . [and] seeks to increase government accountability by limiting state-level interference in local affairs." *Watson*, 189 Wn.2d at 166-67. "This is particularly important with respect to local taxation authority." *Id*. at 167.

In 1965, the legislature formed a temporary special municipal code committee tasked with either the complete revision of the laws governing municipal corporations or the development of an alternative optional municipal code. LAWS

---

[8] *See, e.g.*, *Tacoma Gas & Elec. Light Co. v. City of Tacoma*, 14 Wash. 288, 291, 44 P. 655 (1896) ("It is a well settled rule of construction that a delegation of powers will not be presumed in favor of a municipal corporation unless they be such as are necessary to its corporate existence, but that the same must be clearly conferred by *express* statutory enactment." (emphasis added)).

OF 1965, Ex. Sess., ch. 115 § 1, 2.  The legislature directed the committee to prepare "a code of laws for the government of cities and towns which shall include a form of statutory home rule." *Id*. § 2.  The committee's work led to the optional municipal code now codified under Title 35A RCW.  LAWS OF 1967, Ex. Sess., ch. 119.

The committee report preceding Title 35A RCW's enactment noted that one of the drafters' basic objectives was "[t]he *broad grant of home rule authority to municipalities* without a specified enumeration of powers, thus avoiding continuously burdening the state legislature with a multiplicity of municipal housekeeping bills at each session."  MUN. CODE COMM., WASH. STATE LEGISLATURE, A REVIEW OF THE OBJECTIVES OF THE MUNICIPAL CODE COMMITTEE 2 (1966) (emphasis added).  The legislative committee further noted its clear intent to abrogate Dillon's Rule:

> Chapter 35A.11 . . . directs that the laws be liberally construed in favor of the city as a *clear mandate to abandon the so-called* "*Dillon's Rule*" *of construction*.  In addition to the general grant of broad powers, the chapter makes clear that existing laws relating to . . . taxation . . . shall be available to the code cities.

MUN. CODE COMM., *supra*, at 4 (emphasis added); *see also* Spitzer, *"Home Rule,"* *supra*, at 840.  The optional municipal code thus superseded Dillon's Rule in 1967, as plainly expressed in RCW 35A.01.010.[9]

---

[9] "The purpose and policy of this title is to confer upon two optional classes of cities created hereby the broadest powers of local self-government consistent with the

Despite this history, the Districts rely on *Algona* to argue the City must have "express" authorization to impose the excise tax on them. We disagree and decline to extend *Algona* to perpetuate this mistaken reading.

In *Algona*, the city adopted an ordinance levying a seven percent business and occupation tax on the gross revenues collected at a solid waste transfer station located within the city's limits. 101 Wn.2d at 790. The county petitioned for declaratory judgment, arguing the city had no express authorization to levy such a tax. *Id*. at 791. The court stated, "We have consistently held that municipalities must have *express* authority, either constitutional or legislative, to levy taxes." *Id*. The court determined "[t]he general grant of taxation power on which Algona relies in RCW 35A.11.020 contains no *express* authority to levy a tax on the State or another municipality." *Id*. at 793. The court also concluded "[t]o allow the City to impose the tax in this case would violate the established rule that municipalities must have specific legislative authority to levy a particular tax." *Id*.

---

Constitution of this state. Any specific enumeration of municipal powers contained in this title or in any other general law shall not be construed in any way to limit the general description of power contained in this title, and any such specifically enumerated powers shall be construed as in addition and supplementary to the powers conferred in general terms by this title. All grants of municipal power to municipalities electing to be governed under the provisions of this title, whether the grant is in specific terms or in general terms, shall be liberally construed in favor of the municipality."

*Algona* actually supports the City in this case; RCW 35A.82.020 grants

municipalities express authority to impose the business and occupation excise tax on

*all* businesses—including the Districts. Even so, *Algona*'s cursory analysis presents

some interpretative difficulties, and we note at least three concerns. First, *Algona*

fails to analyze RCW 35A.82.020's broad grant of taxing authority in any detail.

Second, it echoes language from Dillon's Rule of construction, applying that

outmoded principle to a statute that clearly embraces home rule principles. Third,

*Algona* suggests it might be helpful for a statute to contain "express" language

directly addressing municipal taxation authority over other governmental entities,

yet this has never been a requirement to exercise an otherwise plain delegation of

taxing authority.

Turning to the first concern, the *Algona* court based its decision on the general

grant of taxing power provided to code cities under RCW 35A.11.020:

> "Within constitutional limitations, legislative bodies of code cities shall have
> within their territorial limits all powers of taxation for local purposes except
> those which are expressly preempted by the state as provided in RCW
> 66.08.120, RCW 82.36.440, RCW 48.14.020, and RCW 48.14.080."

101 Wn.2d at 792-93. The court cited RCW 35A.82.020 in passing and noted the

statute "grants code cities *specific authority* to levy B & O taxes," *id*. at 792

(emphasis added), but it devoted no attention to analysis of whether that statute

delegated the required taxing authority. Instead, the court pivoted to the

governmental immunity doctrine. *Id*. at 793-94. Contrary to the Districts' contention, whether the governmental immunity defense shields one municipal corporation from the taxing of another is a different question than whether the legislature "expressly" delegated code cities the authority to levy local excise taxes. *Algona* is thus unhelpful here because it does not purport to address whether RCW 35A.82.020 provides an independent delegation of authority authorizing the imposition of local business and occupation excise taxes.

Second, while the *Algona* court inserted the "express" term to modify municipal taxation authority, article VII, section 9 of the Washington State Constitution does not require as much: "For all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes." Nowhere in the text of the constitution is there a requirement that the legislature delegate taxing authority to municipalities in "express" terms. *See generally* WASH. CONST. art. VII, § 9; art. XI, § 12. Instead, the "express" limiting language, as shown above, is a vestige of Dillon's Rule.

The inherent doctrinal problem with the Districts' reading of *Algona* is that the Districts (and ostensibly the *Algona* court) mistakenly apply Dillon's Rule precepts to a statutory scheme in which the legislature plainly stated that home rule applies. If we trace the "express" term in *Algona* through the case law, we find that

this court likely did follow Dillon's rule in developing the common law governing a municipal corporation's authority to levy local taxes. Still, that common-law precept was superseded by statute when the legislature adopted Title 35A RCW. And our goal when interpreting statutes is to "ascertain and carry out the Legislature's intent." *Campbell & Gwinn,* 146 Wn.2d at 9.

The *Algona* court relied on three cases to support its statement that the legislature must delegate taxing authority in "express" terms: *Citizens for Financially Responsible Gov't v. City of Spokane*, 99 Wn.2d 339, 343, 662 P.2d 845 (1983); *Hillis Homes, Inc. v. Snohomish County*, 97 Wn.2d 804, 809, 650 P.2d 193 (1982); and *Carkonen v. Williams*, 76 Wn.2d 617, 627-28, 458 P.2d 280 (1969).

*Citizens for Financially Responsible Government* in turn relied on McQuillin's *Municipal Corporations* to provide, "The general rule is municipalities possess, with respect to taxation, only such power as has been granted to them by the constitution or the general laws of the state." 99 Wn.2d at 343 (citing 16 EUGENE MCQUILLIN MUNICIPAL CORPORATIONS § 44.05 (3d ed. 1981)). Note this language omits the "express" limiting term and requires a delegation only under "the constitution or the general laws of the state." *See id*.

The "express" language does appear in *Hillis Homes*, however. There, the court asserted, "This court has clearly stated that 'county authorities must have

*express* authority, either under the constitution or an act of the legislature, to levy taxes.'" 97 Wn.2d at 809 (emphasis added) (quoting *State ex rel. Sch. Dist. 37 v. Clark County*, 177 Wash. 314, 322, 31 P.2d 897 (1934)). The case cited, *School District 37*, provides no authority for this proposition; it also predates the enactment of Title 35A RCW by over 30 years. *See id*. Even so, we may fairly infer that the court there also based its reasoning on Dillon's Rule precepts.

*Carkonen* likewise provides "political subdivisions [such as counties and other municipal authorities] must have an *express* grant of such power either by legislative act or other constitutional provision." 76 Wn.2d at 627 (emphasis added). Although *Carkonen* similarly cites the unsupported proposition in *School District 37*, it also points to *Great Northern Railway Co. v. Stevens County*, 108 Wash. 238, 183 P. 65 (1919). *Great Northern Railway*—unlike *School District 37*—cites Cooley's treatise on taxation to outline the rule governing municipalities' authority to levy taxes:

> "The fact that the state creates municipal governments does not by implication clothe them with the power to levy taxes. That power must be conferred in terms, or must result by necessary implication from the language made use of in the law. *But it is not requisite that any particular technical or legal terms shall be made use of in giving the power; it is enough that the purpose is apparent, and that on a fair construction of the language employed the legislature must be deemed to have intended that the power should exist*."

108 Wash. at 241-42 (emphasis added) (quoting 1 THOMAS M. COOLEY, A TREATISE ON THE LAW OF TAXATION 465 (3d ed. 1903)). Rather than foreshadow Dillon's Rule, Cooley's treatise negates the premise that the legislature must delegate authority in "express" terms. Cooley was concerned with legislative intent, regardless of the terms used. *See id*. Indeed, "Cooley argued for a local right to self-government and for a less restrictive view of local government powers than did Dillon." Spitzer, *"Home Rule," supra*, at 815.

The *Great Northern Railway* opinion adopts Cooley's less restrictive view concerning legislative delegations of municipal taxing authority, though *School District 37* likely gleaned the "express" requirement from Dillon's treatise directly or from other cases relying on Dillon. But there is no way to know for certain, because *School District 37* failed to cite its source of authority. So, to the extent that *Algona* requires "express" authority for one municipality to tax another, it mainly relies on a case that lacks authority to support its legal proposition. We decline to read *Algona* to perpetuate an unsupported common-law proposition that does not have its roots in the constitution or general laws of the state. *See* Spitzer, *"Home Rule," supra*, at 856-59.

As a final point, other analysis in *Algona* undermines the Districts' view. The *Algona* court recognized that municipal taxation authority extends to proprietary

functions of municipal corporations but held that the county's operation of a solid waste transfer station was a governmental function. 101 Wn.2d at 794. The governmental aspect was critical to the court's analysis of earlier cases that had found sufficient taxing authority. *Algona* distinguished *City of Seattle v. State*, 59 Wn.2d 150, 153-54, 367 P.2d 123 (1961) (interpreting ch. 82.04 RCW), and partially overruled *City of Bellevue v. Patterson*, 16 Wn. App. 386, 556 P.2d 944 (1976), which it held erroneously relied on *City of Seattle*. 101 Wn.2d at 792-95. Unlike the statute at issue in *City of Seattle*, which defined a "person" subject to business and occupation tax to include a municipal corporation and encompassed both proprietary and governmental functions, RCW 35A.82.020 did not define its terms. *See Algona*, 101 Wn.2d at 792-93. *Algona* thus refused to read RCW 35A.82.020—authorizing only the imposition of excises on businesses—to extend to governmental functions, including the operation of a solid waste transfer station. *Id*. at 795. The City correctly observes that had the *Algona* court meant to say more, it would have overruled *Patterson* entirely.

In sum, we recognize Dillon's Rule as a vestige of 19th century jurisprudence that no longer applies to code cities given current statutes. We decline to extend *Algona* to perpetuate this rule. Instead, we adhere to "[t]he general rule [that] municipalities possess, with respect to taxation, only such power as has been granted

to them by the constitution or the general laws of the state." *Citizens for Financially Responsible Gov't*, 99 Wn.2d at 343. No "express" language calling out municipal corporations is needed; general articulations of municipal taxing authority are sufficient as long as the legislature's intent is plain. In the context of code cities, "[a]ll grants of municipal power . . . whether the grant is in specific terms or in general terms, shall be liberally construed in favor of the municipality." RCW 35A.01.010. For these reasons, we hold RCW 35A.82.020 delegates the City sufficient authority to impose the business and occupation excise tax on the Districts.[10] We now turn to whether the governmental immunity doctrine shields the Districts from the tax.

---

[10] The dissent vastly overestimates the extent of our holding today. Consistent with the constitution and general laws of the state, we hold only, "[f]or all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes," WASH. CONST. art. VII, § 9, and "municipalities possess, with respect to taxation, only such power as has been granted to them by the constitution or the general laws of the state." *Citizens for Financially Responsible Gov't*, 99 Wn.2d at 343. Despite the cases regurgitating that the legislature must vest municipal corporations with taxing authority in "express" terms— *see, e.g.*, *Algona*, 101 Wn.2d at 791-92; *Hillis Homes,* 97 Wn.2d at 809; *Carkonen*, 76 Wn.2d at 627-28; *State ex rel. Sch. Dist. 37*, 177 Wash. at 322—nowhere in the text of the constitution or general laws of the state does such a requirement exist with respect to code cities. *See generally* WASH. CONST. art. VII, § 9; art. XI, § 12; Title 35A RCW.

In any event, none of the cases relied on by the dissent address the question presented today: whether a code city, which adopts its charter under Title 35A RCW, must have "express" authority to impose a business and occupation excise tax on another municipal corporation doing business within its borders. For that reason, we need not engage in a stare decisis analysis of whether these prior statements of law are incorrect and harmful. *Contra* Johnson, J. (dissenting) at 1, 3. "'Where the literal words of a court opinion appear to control an issue, but where the court did not in fact address or consider the issue, the ruling is not dispositive and may be reexamined without violating stare

### III. THE GOVERNMENTAL IMMUNITY DOCTRINE

The Districts argue the governmental immunity doctrine shields them from the excise tax levied by the City because they perform a governmental function. "The governmental immunity doctrine provides that one municipality may not impose a tax on another without express statutory authorization." *Algona*, 101 Wn.2d at 793. The "express" term in this context does not harken back to Dillon's Rule. Instead, the legislature must grant municipal corporations authority to tax governmental functions in express terms, as governmental functions enjoy implied tax immunity absent contrary legislative intent. *Chelan County Pub. Util. Dist.*, 181 Wn. App. at 343.

"'There are probably few tenets of American jurisprudence which have been so unanimously berated as the governmental immunity doctrine.'" *Kelso v. City of Tacoma*, 63 Wn.2d 913, 915, 390 P.2d 2 (1964) (quoting *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 33, 115 N.W.2d 618 (1962)). "The doctrine of governmental immunity springs from the archaic concept that 'The King Can Do No Wrong.'" *Id*. at 914. This principle of English law posited that the king's own courts were without jurisdiction to consider lawsuits against the sovereign and represents the origin of the doctrine of sovereign immunity. Hugh D. Spitzer, *Realigning the*

_____

decisis.'" *Piel v. City of Federal Way*, 177 Wn.2d 604, 619, 306 P.3d 879 (2013) (quoting *ETCO, Inc. v. Dep't of Labor & Indus.*, 66 Wn. App. 302, 307, 831 P.2d 1133 (1992)).

*Governmental/Proprietary Distinction in Municipal Law*, 40 Seattle U. L. Rev. 173, 190 (2016). Jurists accepted this doctrine "in the early American Republic without question and for many years."[11] *Id*.

In applying the governmental immunity doctrine, we have, over the years, accepted that "[a] municipal incorporation possesses a two-fold character." *City of Seattle v. Stirrat*, 55 Wash. 560, 564, 104 P. 834 (1909). It has both a "'governmental or public character'" and a "'proprietary or private character.'" *Id.* at 564-565 (emphasis omitted) (quoting 1 JOHN. F. DILLON COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 66, at 107-08 (4th ed. 1890)); *see also Okeson*, 150 Wn.2d at 549 (noting a municipal corporation acts either in a governmental or proprietary capacity). "'In its governmental or public character it represents the state, while in the other it is a mere private corporation.'" *Stirrat*, 55 Wash. at 565 (quoting *Cincinnati v. Cameron*, 33 Ohio St. 336, 367 (1878)). "The basic concept underlying the governmental/ proprietary distinction is that municipalities act in

---

[11] Since statehood, this court has addressed the governmental immunity doctrine in various contexts. *E.g.*, *Russell v. City of Tacoma*, 8 Wash. 156, 35 P. 605 (1894) (tort liability); *City of Seattle v. Stirrat*, 55 Wash. 560, 104 P. 834 (1909) (governmental contracts); *Kelso*, 63 Wn.2d 913 (tort liability); *Algona*, 101 Wn.2d 789 (taxation); *Okeson*, 150 Wn.2d 540 (taxation); *Burns v. City of Seattle*, 161 Wn.2d 129, 164 P.3d 475 (2007) (governmental contracts); *Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*, 165 Wn.2d 679, 202 P.3d 924 (2009) (statute of limitations exemptions); *Pub. Util. Dist. No. 1 of Okanogan County v. State*, 182 Wn.2d 519, 342 P.3d 308 (2015) (eminent domain).

different modes, i.e., sometimes as 'governments' and sometimes 'like businesses,' and that their powers and their legal obligations should be treated differently depending on which of the two modes they are operating in." Spitzer, *Realigning*, *supra*, at 175.

In *Chelan County Pub. Util. Dist.*, noted above, a concurring member of the Court of Appeals panel lamented that there appear to be no fewer than six tests Washington courts employ when evaluating whether a function is governmental or proprietary. 181 Wn. App. at 352-53 (Fearing, J., concurring). Scholars have ascribed this fact to the various legal contexts in which the distinction arises. Spitzer, *Realigning*, *supra*, at 177 ("A substantial reason for the confusion and for the shifting application of the governmental/proprietary categories is that besides the competing equities and policies, the governmental/proprietary distinction developed in several fields of law, each with its own set of rationales for treating a municipal activity as 'governmental' or 'proprietary.'"). But the applicable rules in any given case will depend on the relevant area of the law under consideration. We thus focus on cases that specifically address the distinction in the context at issue.

In the context of taxation, "[t]he principal test in distinguishing governmental functions from proprietary functions is whether the act performed is for the common good of all, or whether it is for the special benefit or profit of the corporate entity."

*Okeson*, 150 Wn.2d at 550.  We have long held that providing water-sewer services to ratepayers involves a proprietary function of the government.  *See id.* (quoting *Twitchell v. City of Spokane*, 55 Wash. 86, 89, 104 P. 150 (1909) (concluding providing water is a proprietary function because the "consumer pays for a commodity which is furnished for his comfort and use")).

> "Water rates paid by consumers are . . . nothing more than the price paid for water as a commodity. The obligation to pay for the use of water rests either on express or implied contract on the part of the consumer to make compensation for water which he has applied for and received."

*Twitchell*, 55 Wash. at 89 (quoting 30 AM. & ENG. ENCYCLOPEDIA OF LAW 422 (2d ed. 1905)); *see also Pub. Util. Dist. No. 1 of Pend Oreille County v. Town of Newport*, 38 Wn.2d 221, 227-28, 228 P.2d 766 (1951) ("'In the erection and operation of gas works, electric light plants, *waterworks and the like*, . . . a municipal corporation acts as a business concern.'" (emphasis added) (quoting 1 OSCAR L. POND, A TREATISE ON THE LAW OF PUBLIC UTILITIES § 5, at 14-15 (4th ed. 1932))).

Water and sewer utilities "operate[] for the benefit of its customers, not the general public."  *Okeson*, 150 Wn.2d at 550 (discussing the same as applied to electric utilities).

> More generally,

> "When the municipality undertakes to supply, to those inhabitants who will pay therefor, utilities and facilities of urban life, it is engaging in business upon municipal capital and for municipal purposes but not in methods hitherto considered municipal. It is a public corporation transacting private

> business for hire. It is performing a function, not governmental, but often committed to private corporations or persons, with whom it may come into competition. The function may be municipal but the method is not. It leads to profit, which is the object of the private corporation."

*Stirrat*, 55 Wash. at 565-66 (quoting 28 CYC. *Municipal Corporations* 125 (1908)). To be sure, the Districts are municipal corporations, but they are engaged in the business of providing water-sewer services to ratepayers. Consistent with long-standing precedent, we hold providing water-sewer services to ratepayers is a proprietary function.

The Districts insist that the governmental immunity doctrine is not confined to governmental services and urge us not to apply the governmental/proprietary distinction here. This argument lacks merit. The governmental/proprietary distinction is integral to the governmental immunity doctrine and is firmly established in this court's jurisprudence. To the extent that the Districts and amici argue that we should abandon the distinction altogether and develop a form of common law municipal entity immunity, we decline that invitation.

The Districts and amici next contend that the provision of water-sewer services is public or governmental in nature because such services are essential in modern society. They argue that water-sewer services constitute a public necessity, which the government provides for the common good of all. They detail the public health and safety benefits of access to clean, potable water, as well as sewer services.

They further analogize to *Algona*, arguing there is no difference between solid waste disposal (a governmental function) and the disposal of sewage sludge. They claim that while private corporations may have provided water-sewer services in the past, mostly local governments now provide these services.

To the extent that they highlight the value and importance of water-sewer services, the Districts' arguments resonate. Still, they miss the mark in terms of governmental immunity analysis. Simply put, it is the *ratepayer structure* that makes the Districts' business activities, like any other utility billed directly to paying customers, proprietary. *See Okeson*, 150 Wn.2d at 550. The Districts bill ratepayers for their consumption and use just as with other commodities—filling a pool, watering a garden, flushing a toilet, taking a shower, all cost money and will be reflected in the price the consumer pays for the commodity which is furnished for his [or her] comfort and use. *See Twitchell*, 55 Wash. at 89. That water quality and sanitary regulations protect consumer health and safety does not transform the Districts' proprietary services into governmental functions. And the broader theme in the Districts' and amici's argument, suggesting that the ratepayer model is no longer viable for water-sewer services, is simply a policy question not before us.

Finally, the Districts assert the City may not tax ratepayer revenue devoted to pay for other governmental functions—for instance, hydrant maintenance revenue.

But providing utility services "cannot be a proprietary function for some purposes, but a governmental function for others." *Okeson*, 150 Wn.2d at 551. Cities levy business and occupation excise taxes on the privilege of engaging in business and measure those taxes by gross income or receipts. *Watson*, 189 Wn.2d at 168. The City may therefore impose a tax on the gross income received from water-sewer ratepayers or other proprietary functions in which the Districts engage within the City's limits. To the extent that the Districts receive governmental funds for governmental functions—e.g., fire protection services and hydrants—those allocations are not taxable.[12]

In sum, water-sewer service providers—operating under a ratepayer structure—perform a proprietary function. For that reason, we hold the governmental immunity doctrine does not bar the City from taxing the gross revenue generated from the Districts' proprietary business activities transacted within the City's limits.

---

[12] Whether the Districts may generally use ratepayer revenue to pay for other governmental services is also not properly before us. While this inquiry similarly involves a governmental/proprietary analysis, we decline to address that question again here. *See generally Okeson*, 150 Wn.2d at 549-50; *Lane v. City of Seattle*, 164 Wn.2d 875, 884, 194 P.3d 977 (2008) ("Hydrants, like streetlights, are a government expense for which a government must pay.").

IV. STANDING TO RAISE CONSTITUTIONAL CHALLENGES

The Districts also raise two constitutional challenges, arguing the ordinance violates both the state and federal due process clauses,[13] and the state privileges and immunities clause. The superior court rejected these claims on the merits, after concluding the Districts had standing to raise them. On direct review, the City reasserts its position that the Districts lack standing to bring their constitutional claims. The Districts counter that they have personal standing, but if not, then they have standing in a representational capacity. We hold the Districts lack standing in either capacity.

"The basic test for standing is 'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question'." *City of Seattle v. State*, 103 Wn.2d 663, 668, 694 P.2d 641 (1985) (quoting *Seattle Sch. Dist. No. 1 of King County v. State*, 90 Wn.2d 476, 493, 585 P.2d 71 (1978)). "Standing requirements tend to overlap the requirements for justiciability under the UDJA [Uniform Declaratory Judgments Act, ch. 7.24 RCW]." *Am. Legion Post No. 149 v. Dep't of*

---

[13] The Districts offer no independent state constitutional analysis. Generally, "[i]f a party does not provide constitutional analysis based upon the factors set out in [*State v.*] *Gunwall*[, 106 Wn.2d 54, 720 P.2d 808 (1986)], the court will not analyze the state constitutional grounds in a case." *First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 224, 840 P.2d 174 (1992).

*Health*, 164 Wn.2d 570, 593, 192 P.3d 306 (2008). We apply "a two-part test for standing under the UDJA." *Id*. "First, a party must be within the 'zone of interests to be protected or regulated by the statute' in question. Second, the party must have suffered an 'injury in fact.'" *Id.* at 593-94 (citation and internal quotation marks omitted) (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802, 83 P.3d 419 (2004)).

Generally, municipal corporations do not have rights under the equal protection or due process clauses of the state and federal constitutions. *See Seattle*, 103 Wn.2d at 668; *Samuel's Furniture, Inc. v. Dep't of Ecology*, 147 Wn.2d 440, 463, 54 P.3d 1194 (2002) ("political subdivisions cannot invoke protections of the Fourteenth Amendment against a state" (citing *City of Newark v. New Jersey,* 262 U.S. 192, 196, 43 S. Ct. 539, 67 L. Ed. 943 (1923))).

> "The due process clause protects people from government; it does not protect the state from itself. Municipal corporations are political subdivisions of the state, created for exercising such governmental powers of the state as may be entrusted to them, and they may not assert the protection of the due process clause against action of the state government."

*Seattle*, 103 Wn.2d at 681-82 (Dolliver, J., dissenting) (quoting *Mountlake Terrace v. Wilson,* 15 Wn. App. 392, 394, 549 P.2d 497 (1976)).

The cases the Districts rely on do not permit municipal corporations to bring due process claims. Instead, those cases address certain constitutional rights of private corporations. As noted, water-sewer districts are political subdivisions of

the state. Whether acting in a proprietary or governmental capacity, municipal corporations do not have personhood like private corporations do. The implications of the District's argument based on *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), for instance, give us pause. If we were to accept the premise that municipal corporations are no different from private corporations, the Districts' argument would seem to suggest they enjoy the same First Amendment right to spend money on elections. *See generally id.* (holding that the government may not, under the First Amendment, suppress political speech based on the speaker's corporate identity). No precedent in Washington recognizes this degree of personhood for municipal corporations, and it would corrode the democratic process to allow political subdivisions of the state to voice support for causes or candidates for office.

At bottom, the Districts' argument for individual standing to assert a due process claim is built on little more than its perceived irony in the City's position: that the City views the Districts as performing proprietary functions yet denies them the same constitutional standing afforded to private proprietors. First, any irony cuts both ways, as the Districts maintain their functions are purely governmental. But more importantly, the unique status of municipal corporations is a feature of constitutional design that courts must respect. Even if private persons can perform

proprietary functions of municipal governments, a governmental entity remains just that. Municipal corporations have never been recognized as "persons" to the same extent as private corporations under the federal or state constitution. We hold the Districts lack standing to assert their due process vagueness argument under the Fourteenth Amendment of the United States Constitution and article I, section 3 of the Washington State Constitution. *See Samuel's Furniture*, 147 Wn.2d at 463.

The Districts alternatively claim they have representational standing to assert claims on their ratepayers' behalf. We disagree.

"An organization 'has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Legion Post*, 164 Wn.2d at 595 (quoting *Hunt v. Wash. State Apple Advert. Comm'n.,* 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)). "This court has adopted a more liberal approach to standing 'when a controversy is of substantial public importance, immediately affects significant segments of the population, and has a direct bearing on commerce, finance, labor, industry, or agriculture.'" *Id*. (quoting *Grant County*, 150 Wn.2d at 803).

Here, ratepayers would likely have standing to challenge the ordinance. And neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Still, the Districts have not shown that the interests they seek to protect are germane to their purpose. As "special purpose" water, sewer, or combined water-sewer districts, their primary purpose is providing water-sewer services to ratepayers. No evidence in the record shows ratepayers receive diminished water-sewer services from the Districts because of the excise tax. *See Grant County*, 150 Wn.2d at 804 (holding that fire districts lacked representational standing because they could not show the residents would receive less effective fire protection or other emergency services). The only interest the Districts seek to protect is relief from a tax burden. Because ratepayers would likely have personal standing to argue the ordinance is unconstitutionally vague, we need not apply our liberal approach to standing here. *See id.*

The Districts next claim they have standing to pursue a claim under article I, section 12—they do not. Washington's privileges and immunities clause provides, "No law shall be passed granting to any citizen, class of citizens, or *corporation other than municipal*, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12 (emphasis added). "Where the text of a constitutional provision is plain, the court must give

the language its reasonable interpretation without further construction." *Locke v. City of Seattle*, 162 Wn.2d 474, 482, 172 P.3d 705 (2007).

Based on its text, we have long held that our state privileges and immunities clause does not apply to municipal corporations. *E.g.*, *Bilger v. State*, 63 Wash. 457, 469, 116 P. 19 (1911) ("municipal corporations . . . are expressly excepted from the terms of the prohibition"); *City of Spokane v. Spokane County*, 179 Wash. 130, 136, 36 P.2d 311 (1934) ("this constitutional provision by its terms does not relate to municipal corporations"); *Locke*, 162 Wn.2d at 482 ("By its express language, article I, section 12 does not apply to municipal corporations."). The federal cases and out of state authority the Districts rely on do not alter our long-standing interpretation of standing under article I, section 12 of the Washington State Constitution.

The Districts' lack of standing is fatal to their due process and privileges and immunities claims, and we decline to consider the merits of such claims.

CONCLUSION

We affirm the superior court's ruling granting summary judgment to the City. The legislature properly delegated the City authority to impose the excise tax on the Districts, and the governmental immunity doctrine does not shield the Districts from the excise because they perform a proprietary function in providing water-sewer

services to ratepayers.  The Districts lack standing to bring their constitutional claims challenging the tax.

Stephens, C.J.

WE CONCUR:

_____

Gordon McCloud, J.

_____

_____

Owens, J.

Montoya-Lewis, J.

González, J.

Wiggins, J.PT

No. 96585-4

MADSEN, J. (concurrence/dissent)—I agree with the majority on the merits of this case:  the City of Federal Way has authority under RCW 35A.82.020 to impose local excise taxes on water and sewer districts (Districts) within its borders, and governmental immunity does not shield the Districts from taxes imposed on the gross income received from providing proprietary water-sewer functions.  *See generally* majority at 8-30.

I diverge with the majority on the issue of standing.  In my view, the Districts have representational standing on behalf of their ratepayers, and the majority's holding advances a rigid and unwarranted interpretation of our standing requirements. Organizations may bring suits on behalf of their members, provided the members would otherwise have standing to sue, the purpose of the organization is germane to the issue, and neither the claim nor the relief requires the participation of individual members.  *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 304, 268 P.3d 892 (2011) (citing *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 213-14, 45 P.3d 186 (2002)).  I agree with the majority that the Districts satisfy two elements of the *Five Corners* test, that ratepayers would likely have standing to contest the ordinance and

neither the claim nor the requested relief requires participation of individual members. Majority at 35. But unlike the majority, I would hold that the Districts also satisfy the final *Five Corners* element of seeking to protect interests germane to the Districts' purpose—the interests of their ratepayers in not paying higher rates for water-sewer services stemming from the imposition of excise taxes.

The majority faults the Districts for failing to show that the provision of water-sewer services would be diminished as a result of the tax. Majority at 35. But, that is not the test, and such a showing is more onerous than our standing case law requires. An organization's purpose must be germane to the legal issue. *Five Corners*, 173 Wn.2d a 304; *see also Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 595, 192 P.3d 306 (2008). *Black's Law Dictionary* defines "germane" as "[r]elevant; pertinent." BLACK'S LAW DICTIONARY 830 (11th ed. 2019). This definition indicates a measure of distance in meaning. In other words, an organization's purpose must be related to the legal issue asserted, but it does not have to be either identical to or the primary purpose of the organization. Here, the Districts' primary purpose is providing water-sewer services at specific rates. The imposition of the excise tax will affect these rates and thus the ratepayers. The Districts' purpose in providing services to ratepayers is related, that is, germane to the ratepayers' interests in contesting the excise tax ordinance.

The majority's narrow understanding fails to recognize that these issues affect ratepayers and are germane to their interests and the purpose of the water-sewer districts. An organization's purpose must be related to the interests of its members when bringing a

2

suit on their behalf. We must interpret and apply this requirement with mindful balance

so that we close the doors only to suits that are irrelevant to an organization's members,

lest we foreclose judicial review and deny access to justice. In close cases, I would err on

the side of access. Fortunately, in this case, it is clear that the Districts have

representational standing under well-established standing rules.

I would agree with the trial court in this case. The Districts have standing to bring

constitutional challenges in a representational capacity but do not succeed on the merits

of the claims.

With these thoughts in mind, I respectfully concur in part and dissent in part.

*Lakehaven Water & Sewer Dist. et al. v. City of Federal Way*

No. 96585-4

JOHNSON, J. (dissenting)—The majority drastically abandons well-settled law and grants code cities seemingly unlimited authority to levy taxes—authority not expressly delegated by statute. In crafting this new approach, the majority grants taxing authority to cities that the legislature has consistently and recently rejected. Most troubling, the majority's new rule provides no restraints on local tax rates, contrary to limits the legislature commonly provides. The majority abandons our principles of stare decisis, rejecting decades of court decisions resolving this exact issue. The superior court should be reversed.

Historically, Washington cities have understood that RCW 35A.82.020, enacted in 1967, does not grant authority to tax other government utilities providing water and sewer services, and that whatever authority is claimed must come from the legislature. This understanding is evidenced by the introduction, and failure, of legislation that would have granted cities the authority to tax districts providing water and sewer services, all of which proposed a tax rate limit of six percent on water-sewer districts. *See, e.g.*, H.B. 2249, § 6, 61st Leg., Reg.

Sess. (Wash. 2009); H.B. 2637, § 6, 61st Leg., Reg. Sess. (Wash. 2010); H.B.

2749, § 7, 61st Leg., Reg. Sess. (Wash. 2010).

The majority not only creates the taxing authority here but provides no limit.

The legislature knows how to expressly delegate taxing authority. For example, in

2010, the legislature enacted former RCW 35.13B.010 (2010), authorizing the city

of Renton to impose a utility tax, similar to the one at issue here, which expired in

2015 and has not been reenacted. Under the majority's reasoning, there was no

need to introduce these bills, and the taxing authority under former RCW

35.13B.010 was somehow superfluous, based on the majority's new expansive

general taxing authority under RCW 35A.82.020. The power of taxation does not

work in this manner.

Generally, taxing authority is an inherent power of state government and not

a power inherent in local government. Instead, the taxation authority flows from

legislative delegation. We have recognized where the legislature delegates taxing

authority to a municipality, the delegation must be made in *express* terms.

> Article 7, section 9 and article 11, section 12 of the Washington
> State Constitution permit the State Legislature to grant municipal
> authorities the power to levy and collect taxes for local purposes.
> These constitutional provisions are not self-executing. *Carkonen v.
> Williams,* 76 Wn.2d 617, 458 P.2d 280 (1969). We have consistently
> held that municipalities must have *express* authority, either
> constitutional or legislative, to levy taxes. *Citizens for Financially
> Responsible Gov't v. Spokane,* 99 Wn.2d 339, 662 P.2d 845 (1983);

2

> *Hillis Homes, Inc. v. Snohomish* [*County*], 97 Wn.2d 804, 650 P.2d
> 193 (1982); *Carkonen v. Williams, supra.*

*King County v. City of Algona*, 101 Wn.2d 789, 791-92, 681 P.2d 1281 (1984)

(footnote omitted). This rule is strongly established in our cases as a basic principle

of government. We should depart from this general principle only on a clear

showing that the established rule is "'incorrect and harmful'" or *rarely* when we

are compelled to forgo prior precedent where the legal underpinnings of our

precedent have changed or disappeared. *State v. Otton*, 185 Wn.2d 673, 678, 374

P.3d 1108 (2016) (quoting *In re Rights to Waters of Stranger Creek*, 77 Wn.2d

649, 653, 466 P.2d 508 (1970)). While the majority attempts to distinguish this rule

from the present case, the requirement that delegations of taxing authority be

express is a rule that reaches *all* delegations of taxing authority to subdivisions of

the State.

The majority does not engage in, or even attempt to apply, an "incorrect and

harmful" analysis, likely because the express authority requirement is neither

incorrect nor harmful. As stated, the general rule is that taxing authority is vested

in the legislature, not in municipalities. It makes sense to require express

delegations of taxing authority to ensure that municipalities exercise no more

authority than the legislature intended to give them. Rather than being harmful, the

express delegation requirement protects citizens from municipalities exercising broad taxing authority.

The majority seems to suggest that this case is one of the rare occasions where the legal underpinnings of our precedent have changed and describes the express delegation rule we embraced in *Algona* as an outdated vestige of "Dillon's Rule," which has purportedly been statutorily rejected. The majority traces the express authority requirement from *Algona* to *School District 37*, asserting that *School District 37* failed to cite a source of authority for adopting the express requirement and asserted that the case likely relied on Dillon's Rule. *See State ex rel. Sch. Dist. 37 v. Clark County*, 177 Wash. 314, 322, 31 P.2d 897 (1934). The inaccuracy of this assertion is quickly revealed when the express requirement from *School District 37* is viewed in its larger context:

> Section 9, Art. VII, and § 12, Art. XI, of the state constitution, providing that the power to assess and collect taxes may be vested in the corporate authorities of all municipal corporations, do not grant such power, "but leaves it to be granted by the legislature, attended by such conditions and limitations as that body may prescribe." *Great Northern R. Co. v. Stevens County*, 108 Wash. 238, [243-44,] 183 Pac. 65 [1919].
> We repeat, county authorities must have express authority, either under the constitution or an act of the legislature, to levy taxes. They have no right to levy taxes for county purposes at a rate exceeding the limitation fixed by either the constitution or act of the legislature.

4

*Sch. Dist. 37*, 177 Wash. at 322-23. Contrary to the majority's characterization of the express requirement as unsupported, this rule is anchored in our precedent *and* in article VII, section 9 and article XI, section 12 of our constitution. *School District 37* does not mention or rely on Dillon's Rule. The express delegation rule *cannot* be fairly attributed to Dillon's Rule. Instead, requiring delegations of authority to be express is a constitutional principle that prevents delegations of taxing authority from being extended beyond the legislature's intentions. Properly applied, our cases require invalidation of the tax at issue here.

Significantly, the majority's new approach establishes no limitations on local taxing authority. The record in this case discloses that several municipalities have enacted similar taxes with rates varying from 1.5 percent to 36 percent. Often where the legislature chooses to expressly delegate authority, limitations are established. For example, RCW 35.21.870 provides that a city may not tax electrical energy, telephone, natural gas, or steam energy businesses at a rate exceeding six percent.

The constitutional power to delegate taxing authority should remain with the legislature, which should decide whether this taxing authority should be granted, not this court. The trial court should be reversed.